IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JILL FINKEN,<br><br>  Plaintiff,<br><br>vs.<br><br>LORETTA LYNCH., ATTORNEY GENERAL OF THE UNITED STATES, THE UNITED STATES DEPARTMENT OF JUSTICE, AND THE UNITED STATES ATTORNEY'S OFFICE DISTRICT OF NEBRASKA<br><br>  Defendants. | CASE NO.<br><br>**COMPLAINT AND JURY DEMAND** |

**COMES NOW** the Plaintiff, Jill Finken, and in support of her Complaint against Loretta Lynch., Attorney General of United States, the United States Department of Justice, and the United States Attorney's Office District of Nebraska states as follows:

**INTRODUCTION**

1. This is an action against Loretta Lynch, Attorney General of the United States, the United States Department of Justice, and the United States Attorney's Office District of Nebraska for discrimination, harassment and/or hostile work environment based on Plaintiff's gender, disability (mental and physical), and reprisal for participation in a protected Equal Employment Opportunity activity in violation of her rights protected by federal law.

2. This action is brought to redress Jill Finken's rights under the Americans with Disabilities Act ("ADA") (42 U.S.C. §12101 *et seq.*), the Rehabilitation Act of 1973 (29 U.S.C. §701 *et seq.*), and the Civil Rights Act of 1964 ("Title VII") (29 U.S.C. §621 *et seq.*).

3. This action is brought by Jill Finken. She was subjected to discrimination based upon her gender and her disability as a result of her military service in Afghanistan. Jill Finken was denied a permanent position with the United States Attorney's Office in the District of Nebraska and less qualified individuals were hired in her stead. Jill Finken complained that she was being discriminated against by complaining to human resources with the District of Nebraska and by filing an EEO complaint. After filing the EEO complaint she was retaliated against and forced to resign her position.

### JURISDICTION AND VENUE

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 42 U.S.C. §12101 *et seq.*, 29 U.S.C. §701 *et seq.,* 42 U.S.C. §2000e *et seq*.

5. The unlawful employment practices described herein were committed within the State of Nebraska in Douglas County. Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

### PARTIES

6. Plaintiff Jill Finken is a resident of Blair, Washington County, Nebraska, and was at times material hereto an employee of U.S. Department of Justice working in the Omaha office of the United States Attorney for the District of Nebraska.

7. Plaintiff Jill Finken was employed as a Special Assistant United States Attorney for the District of Nebraska (SAUSA).

8. Defendant Loretta Lynch., (hereinafter "Defendant"), is the Attorney General of the United States and the head of the U.S. Department of Justice, and the U.S. Attorney for the

District of Nebraska. At the time Jill Finken was employed, Eric Holder oversaw the U.S. Department of Justice.

9. At all relevant times to this lawsuit, Jill Finken was employed by the Defendants collectively.

**FACTUAL BACKGROUND**

10. Jill Finken began her position as a SAUSA for the District of Nebraska in October 2012.

**Gender Bias in the Failure to Prosecute Sexual Assault and Domestic Abuse Cases**

11. The Office on Violence Against Women funded that grant provided to the District of Nebraska for the purpose of prosecuting crimes against women and children occurring on Indian Reservations.

12. The Office on Violence Against Women created this grant funded position in an effort to improve the declination rates in Indian Country.

13. Defendants knew or should have known that there can be a number of causes for declination rates some of which depend on the perceptions of the prosecutor.

14. Defendants knew or should have known that implicit and other forms of gender bias can contribute to declination rates.

15. The Office on Violence Against Women determined there was a specific need for a prosecutor to be hired in the District of Nebraska.

16. Jill Finken was the person hired to prosecute sexual assault, domestic violence and other crimes against women and children taking place on the Indian reservations within the state of Nebraska.

17. Jill Finken's position was funded by a grant for three years.

18. The individual in charge of deciding whether to prosecute crimes against women and children on the Indian Reservations was primarily AUSA Doug Semisch with oversight by AUSA Jan Sharp.

19. During the course of her employment, Jill Finken observed behavior that suggested that gender bias and/or double standards placed on females and female victims had been contributing to the declination rates and prosecution success rates within the state of Nebraska.

20. As soon as Jill Finken tried prosecuting the criminal defendants for violent and sexual crimes against women and children, she immediately was resisted.

21. Specifically, Mr. Semisch would side with the male defendants and even make comments blaming the female victims.

22. Mr. Semisch stated that the 13 year-old girl who was the victim of rape had likely caused the situation herself by acting older and flirting with the defendant.

23. Mr. Semisch also made comments about how victims of sexual assault and domestic violence should not be believed because they returned to the abuser or acted in a way in which he personally believed a victim of domestic abuse should not act.

24. Mr. Semisch would engage in comments indicating gender stereotypes. For example, without any evidence to support his belief he would suggest that female victims were making up the sexual allegations "so her boyfriend would not be mad at her."

25. On another occasion when a female victim was reluctant to talk about the abuse she suffered, he stated that she was "uncooperative" and she should be "thankful for what he was doing."

26. As a result of gender bias, rather than focusing on the defendant's actions, Mr. Semisch focused primarily on attacking the credibility of the female victim.

27. Victims of sexual assault or domestic violence may act in a manner that appears counterintuitive.

28. Jill Finken tried to explain counterintuitive victim behavior to Mr. Semisch, but he did not want to listen or change his opinions on how female victims of domestic abuse and sexual assault are supposed to act.

29. Mr. Semisch often discouraged Jill Finken from trying to prosecute cases against defendants who were accused of sexual assault or domestic violence.

30. Despite resistance from Mr. Semisch, Jill Finken improved the declination rates substantially by prosecuting the domestic violence and sexual assault claims on the Indian Reservation.

**Mr. Semisch's Biased Behavior towards Professional Women**

31. During her employment Jill Finken observed Mr. Semisch engaging in actions and comments that indicated a biased perception of professional females that was consistent with his behaviors indicating a biased perception of female victims.

32. During her employment Jill Finken was very good at her job and made considerable improvement to the conviction rates.

33. Yet despite her objective success, if Jill Finken tried to provide ideas about how to prosecute the cases, Ms. Semisch would explode verbally at her by screaming and yelling at her.

34. Mr. Semisch provided further indications of gender bias when he referred to himself as Jill Finken's "abusive husband" after he screamed at her.

35. On one occasion, Mr. Semisch was screaming at Jill Finken on the phone while she was visiting her mother in the evening. The next morning Mr. Semisch's wife called and apologized on his behalf saying he is a really good man and asked Jill Finken to wish him a happy birthday.

36. Defendant knew or should have known that the above behaviors and comments were all indicative of gender bias and consistent with Mr. Semisch's behavior and comments indicating gender bias toward female victims.

37. Certainly no male employees were asked to wish Mr. Semisch a happy birthday.

38. No male employees assigned to work under Mr. Semisch were screamed at like the female employees.

39. Jill Finken was hired at approximately the same time as another male AUSA, Don Kleine.

40. Mr. Kleine had less experience that Jill Finken, but was hired for the AUSA position while Jill Finken was hired for the SAUSA position.

41. Despite starting at the same time, Mr. Kleine was not micromanaged and free to run his own cases within a couple of months.

42. Jill Finken, on the other hand, was required to report all of her decisions to Mr. Semisch.

43. On one occasion Jill Finken and Don Kleine were discussing issues when Mr. Semisch burst into the office and was extremely rude and hostile towards Jill Finken.

44. Jill Finken asked Don Kleine if Mr. Semisch ever treated him like that; Don Kleine responded no he had not been treated like that and stated something to the effect that everyone knew that Mr. Semisch had a problem with women.

45. In approximately late August or early September 2014, Mr. Semisch presented a case to the grand jury. Mr. Semisch's presentation ran long and when he came out he screamed at the female AUSA stating he could not ask fewer questions just so she could present her case. The female AUSA did not provoke him or ask any questions, and merely responded that her presentation to the grand jury could be moved. A male AUSA was also waiting to present his case to the grand jury. However, Mr. Semisch chose not to shout at the male or minimize the male AUSA's presentation to the grand jury.

46. Mr. Semisch also made inappropriate comments about women generally.

47. On one occasion Jill Finken was supposed to meet Mr. Semisch at a location she was unfamiliar with and had difficulty finding it. When she arrived at the location, she still had her GPS running. When Mr. Semisch heard the female voice on her GPS, Mr. Semisch told her in a gruff and hostile voice "well that's your damn problem; you've got a woman giving you directions."

48. Mr. Semisch also engaged in behavior indicating his lack of comfort or irritation with females in positions of authority such as when he undermined Jill Finken in front of the jury to such an extent that several of the FBI witnesses made comments about how Mr. Semisch was making Jill Finken look bad in front of the jury.

49. These comments and behavior occurred despite objective evidence showing Jill Finken had great success and had great conviction rates in her position as the SAUSA.

50. Despite this success, she was accused of "being too big for her britches" and as "aggressive."

51. In fact, AUSA Jan Sharp stated she "needed to lose a few cases."

52. Defendants knew or should know that males in the legal field are rarely, if ever, characterized as being too big for their britches, and being aggressive is a quality that is welcomed and sought out in male attorneys.

53. No assertive men were described as needing to "lose a few cases."

**Disability Based on Depression**

54. Jill Finken is a veteran having served in Afghanistan for a year in an active war zone.

55. After returning from Afghanistan, she suffered post-traumatic stress disorder and has major depression.

56. She has a 50% disability rating.

57. As a result of her disability, she has appointments at the VA for treatment of her condition.

58. Jan Sharp made comments about how he "never knew where Jill was."

59. The only reasons that Jill would not be in proximity to Mr. Sharp would be when she was on the Indian Reservation or when she was at her medical appointments at the VA.

60. Mr. Sharp took Jill Finken's disability into consideration when providing her with a review.

61. Because of Ms. Finken's disability, after she had a baby, she suffered from post-partum depression, which caused her to take more than six weeks off of work for the birth of her daughter.

62. While the review was very good, Mr. Sharp specifically stated that she was able to do a good job despite having to take an extended maternity leave.

63. Because of Ms. Finken's military preference and disability status, she should have been given a 10 point veteran's preference.

**Failure to Hire to Permanent AUSA Position**

64. The U.S. Attorney Office in the District of Nebraska had three openings for an AUSA during the time in which Jill Finken was employed.

65. Jill Finken applied for all three positions and was denied, despite being not only highly qualified but likely the most qualified.

66. Jill Finken graduated number one in her class from Drake University Law School in 2004.

67. Jill Finken clerked for Judge Mark Bennett in the Northern District of Iowa where she handled his entire civil docket.

68. She worked in private practice at a prestigious law firm in Sioux City doing civil work prior to her deployment to Afghanistan.

69. While she was in Afghanistan, she did everything from negotiating million dollar contracts to prosecuting soldiers for attempted murder.

70. On approximately July 9, 2014, Jill Finken was not hired for an AUSA position with the criminal unit.

71. Rather a male with no known disability or veteran's preference was selected for that position.

72. Around the same time period, Jill Finken also applied for a position with the civil unit.

73. A female with less experience, no known disability, and no veteran's preference was hired.

74. A third position in the civil unit became available and a male with far less experience, no known disability and no veteran's preference was hired.

75. Jill Finken had experience with the U.S. Attorney's Office as a SAUSA, while none of the other candidates had any experience with the U.S. Attorney's Office.

76. Jill Finken's qualifications were equal to or greater than the candidates that were selected for the position.

77. Jill Finken should have been hired for these positions as her Veteran's Preference of 10 points should have made her the clear front runner.

**Informal and Formal Complaints**

78. Jill Finken repeatedly told Doug Semisch that she did not want him to treat her in the manner that he was treating her.

79. She initially asked him to stop.

80. She then told him that the behavior must stop on multiple occasions.

81. When he told her that he would not stop yelling at her and treating her disrespectfully, she tried keeping her distance from him and only communicating with him on a professional level when necessary.

82. Mr. Semisch then started sending her text messages and asking her why she was so distant.

83. Jill Finken specifically told him she could maintain a professional relationship with him but was unable to have a friendly relationship with him because of the way he treated her.

84. Jill Finken also complained to Denise Smith, the administrative officer, about the way in which she was treated by Doug Semisch.

85. Denise Smith indicated she would talk to Mr. Semisch, but failed to do so.

86. Jill Finken's complaints of Mr. Semisch to Denise Smith were ignored and not investigated.

87. On or about August 11, 2014, Jill Finken filed an EEO Complaint regarding the failure to hire her for AUSA positions based upon her sex and disability, and that she was subjected to a hostile work environment.

88. Jill also specifically request the U.S. Attorney Deborah Gilg conduct an investigation, but she refused.

89. Instead, shortly after her EEO complaint was filed, Mr. Semisch started keeping a "drop file" on her where he was building up a file to use against her as a reason to terminate her.

90. After Jill Finken filed her EEO complaint, she had cases removed from her and assigned to other attorneys.

91. After Jill Finken filed her EEO complaint, she had additional authority on how to process cases stripped from her to an even greater extent than she had prior to filing the complaint.

92. On September 15, 2014, Jill Finken was forced to resign her employment as no reasonable woman would continue to put up with the hostility based on gender and the failure to promote despite her qualifications.

93. Jill Finken understood that she was never going to be promoted to a permanent position in that office.

94. Defendant knew or should have known that Mr. Semisch possessed bias against women.

95. Defendant knew or should have known that because Mr. Semisch had bias against women that it affected his decisions in prosecuting cases.

96. Defendant knew or should have known that Mr. Semisch provided the benefit of the doubt for credibility to the male defendant rather than to the abused or assaulted female victim.

97. Defendant knew or should have known that because Mr. Semisch had bias against women that he held female attorneys to a higher standard than males.

98. Despite becoming aware of the risks to female victims and female professionals Defendant has only engaged in partial remedy by demoting Mr. Semisch.

99. Defendant has done nothing to address the evidence of gender bias and remains in denial of gender bias as a risk to victims and professional women in the office as whole.

100. Defendant has done nothing to investigate the knowledge of Jan Sharp and other attorneys in Mr. Semisch's chain of command of their awareness or failure to remedy the hostile behavior toward females.

101. Defendant has done nothing to investigate the impact of gender bias on the declination rates based on the exercise of discretion by Doug Semisch or others within his influence.

102. For all the reasons set forth in this Complaint, the Court should impose injunctive and equitable relief that will remedy the hostility, remove the risks of gender bias, and permit the promotion of females.

103. Jill Finken timely filed complaints of discrimination with the EEO office and received a final agency decision. She has filed this claim within 30 days of the final agency decision, hence this action is timely brought.

# CAUSES OF ACTION

## COUNT I
## VIOLATION OF TITLE VII-THE CIVIL RIGHTS ACT

104. Jill Finken incorporates paragraphs 1 through 103 of this Complaint as if fully set forth herein.

105. Under the provisions Title VII, it is unlawful for an employer to discriminate against an employee on the basis of gender or to retaliate against her for engaging in activity protected by Title VII.

106. Defendant's conduct was a motivating factor in that it has discriminated against Jill Finken with respect to her failing to hire her for a AUSA position, treating her equally to male employees, allowing her to be harassed based on gender by her supervising attorneys, subjecting her to different and heightened scrutiny at work, holding her to different and higher standards, forcing her to resign from employment, and retaliating against her for engaging in conduct protected by Title VII, in violation of Title VII.

107. Jill Finken suffered an adverse employment action when Defendants failed to hire her for AUSA positions and then when was constructively discharged.

108. As a proximate result of Defendant's actions, as outlined above, Jill Finken has in the past and will in the future suffer mental and emotional harm, anguish, humiliation, embarrassment, loss of dignity, lost wages and benefits, and lost earning capacity.

109. Jill Finken requests relief set forth below.

## COUNT II
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT/ /REHABILITATION ACT

110. Jill Finken incorporates paragraphs 1 through 109 of this Complaint as if fully set forth herein.

111. Jill Finken is protected from disability discrimination by the ADAAA and Rehabilitation Act because she has a disability, is regarded as having a disability, and/or has a history of having a disability.

112. Jill Finken's disability, perception of a disability, and/or history or record of having a disability was a motivating factor in the Defendant's conduct, including, but not limited to, the following: subjecting her to different and heightened scrutiny at work, holding her to different and higher standards, failing to hire her for a AUSA position, and making the working conditions intolerable forcing Jill Finken to resign from employment, among other things.

113. Jill Finken had a 10 point veteran's preference for her disability related to her military service that was not considered in the hiring process for the positions for which she applied.

114. She was able to perform the essential functions of her job without an accommodation.

115. To the extent that an accommodation was necessary, the only accommodation Jill Finken needed was to be allowed to take off time for her medical appointments with the VA.

116. Defendant's treatment of Jill Finken as set out above constitutes unlawful discrimination against Plaintiff because she is disabled as defined by the ADAAA and the Rehabilitation Acts.

117. Defendant's conduct was willful and/or undertaken with disregard for Jill Finken's federally protected rights.

118. As a proximate result of the Defendant's actions as set forth above, Jill Finken has suffered and will, in the future, suffer emotional distress, mental anguish, pain and suffering, inconvenience, humiliation, loss of the enjoyment of life, medical expenses, and the loss of wages and benefits.

119. Jill Finken requests relief as set forth below.

## VI.   RELIEF

**WHEREFORE**, Jill Finken respectfully requests the Court grant the following relief:

**COUNT I**:

A.   Grant equitable relief in the form of orders requiring Defendant to do the following:

- (i) Refrain from engaging in any employment practice which discriminates on the basis of gender and violates Title VII; and

- (ii) Provide training to its supervisory employees regarding how to effectively avoid engaging in gender discriminatory practices and to report to the court once every six months for a period of three years on the training provided and on its effectiveness; and

- (iii) Require that all disciplinary decisions regarding its employees be reviewed by legal counsel for compliance with EEO laws and regulations prior to implementation; and

- (iv) Monitor the workplace environment to assure that employees are not being treated with hostility based on gender and report annually to the court for a period of three years on its monitoring; and

- (v) Test and evaluate supervisory employees to assure that they do not exhibit or act upon biased or bigoted attitudes and opinions regarding females, do not tolerate disparate treatment based on disability by his or her subordinates, and report annually to the court for a period of three years on its testing and evaluating.

B. Order Defendant to make Jill Finken whole by awarding her lost earnings and the value of her lost benefits and order the reinstatement of Jill Finken to her former position or award her front pay in lieu of reinstatement;

C. Order Defendant to make Jill Finken whole by providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life;

D. Award Jill Finken, against Defendant, a judgment for her reasonable attorney fees and costs pursuant to Title VII;

E. Award pre-judgment interest, against Defendant, as allowed by law; and

F. Grant such further relief as the Court deems necessary and proper.

**COUNT II**:

A. Grant equitable relief in the form of orders requiring Defendant to do the following:

    (i) Refrain from engaging in any employment practice which discriminates on the basis of disability and violates the ADAAA and the Rehabilitation Acts; and

    (ii) Provide training to its supervisory employees regarding how to effectively avoid engaging in disability discriminatory practices and to report to the court once every six months for a period of three years on the training provided and on its effectiveness; and

    (iii) Require that all disciplinary decisions regarding its employees be reviewed by legal counsel for compliance with EEO laws and regulations prior to implementation; and

    (iv) Monitor the workplace environment to assure that employees are not being treated with hostility based on disability and report annually to the court for a period of three years on its monitoring; and

    (v) Test and evaluate supervisory employees to assure that they do not exhibit or act upon biased or bigoted attitudes and opinions regarding persons with disabilities, do not tolerate disparate treatment based on disability by his or her subordinates, and report

annually to the court for a period of three years on its testing and evaluating.

B.      Order Defendant to make Jill Finken whole by awarding her lost earnings and the value of her lost benefits and order the reinstatement of Jill Finken to her former position or award her front pay in lieu of reinstatement;

C.      Order Defendant to make Jill Finken whole by providing compensation for non-pecuniary losses, including without limitation, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation and the loss of the enjoyment of life;

D.      Award Jill Finken, against Defendant, a judgment for her reasonable attorney fees and costs pursuant to the ADAAA and the Rehabilitation Acts;

E.      Award pre-judgment interest, against Defendant, as allowed by law; and

F.      Grant such further relief as the Court deems necessary and proper.

## JURY DEMAND

Jill Finken hereby demands a trial by jury of all issues herein.

## REQUEST FOR PLACE OF TRIAL

Jill Finken requests Omaha as the place for trial.


Respectfully submitted,

Jill Finken, Plaintiff


By: /s/Michael J. Merrick
        One of her Attorneys

NEWKIRK ZWAGERMAN, P.L.C.
Thomas A. Newkirk AT0005791
tnewkirk@newkirklaw.com
Jill M. Zwagerman  AT0000324
jzwagerman@newkirklaw.com
515 E. Locust, Suite 300
Des Moines, Iowa  50309
Telephone:  (515) 883-2000
Fax:  (515) 883-2004

**Pro Hac Vice Admission Pending**


MERRICK LAW FIRM LLC
Michael J. Merrick. No. 19855
merrick@merricklawfirm.com
1823 Harney Street, Suite 300
Omaha, Nebraska 68102
Telephone: (402) 933-4256
Fax: (402) 513-6504

**Local Counsel**